# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **SANTO ACCURSO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 12 C 8394** |
| **v.** | ) | |
| | ) | **Magistrate Judge** |
| **CAROLYN W. COLVIN, Acting** | ) | **Jeffrey Cole** |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security, denying Santo Accurso's claim for Disability Insurance Benefits. The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Plaintiff's motion for summary judgment [Document. No. 18] is granted, and the Commissioner's cross-motion for summary judgment [Document. No. 22] is denied.

## I. PROCEDURAL HISTORY

On January 10, 2008, Mr. Accurso filed a claim for Disability Insurance Benefits ("DIB"), alleging disability since February 1, 2006. His claim was denied initially on March 27, 2008 and upon reconsideration. He then timely requested a hearing before an Administrative Law Judge ("ALJ"), which was held on September 17, 2009. Mr. Accurso personally appeared and testified at the hearing and was represented by counsel. Vocational expert William Schweis also testified.

---

[1] Carolyn W. Colvin is substituted for her predecessor, Michael J. Astrue, pursuant to Federal Rule of Civil Procedure 25(d).

On October 15, 2009, the ALJ issued a partially favorable decision on Mr. Accurso's claim, finding that Mr. Accurso was disabled beginning May 1, 2009, but that he was not disabled from February 1, 2006 through April 30, 2009, under the Social Security Act. On December 9, 2009, the Social Security Administration Appeals Council denied Mr. Accurso's request for review, leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). On February 9, 2011, the United States District Court of the Northern District of Illinois, granted Mr. Accurso's motion for summary judgment and remanded the action for further proceedings.

On June 7, 2012, a second administrative hearing was held before an ALJ. Mr. Accurso personally appeared and testified and was represented by counsel. On July 12, 2012, the ALJ again denied Mr. Accurso's claim for Disability Insurance Benefits for the period of February 1, 2006 through April 30, 2009, finding him not disabled prior to May 1, 2009, under the Social Security Act. Mr. Accurso did not file exceptions with the Appeals Council, and the Council did not take jurisdiction over the claim, leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by the District Court under 42 U.S.C. § 405(g).

## II.    FACTUAL BACKGROUND[2]

### A.    Overview

Mr. Accurso was born on June 17, 1966, and was forty-five years old at the time of the June 7, 2012 administrative hearing. (R.108). Plaintiff was unmarried, had a high school education, and lived with his mother and brother. (R. 12-14, 18). Plaintiff had worked more than twenty-three years in construction. (R. 13-14).

---

[2] The following facts from the parties' briefs are undisputed unless otherwise noted.

### B.    The Plaintiff's Testimony

### 1. The 2009 Administrative Hearing

At the September 17, 2009 administrative hearing, Mr. Accurso testified that he was disabled since February 1, 2006 and had not been employed since early 2004. (R. 13). He previously worked in construction installing computer flooring. The work ended because of his knee pain. (R. 13-14). Mr. Accurso stated that he could only walk a quarter to a half block and was prevented from walking more because further movement caused great knee pain. (R.15). He had knee surgery in 2004. (*Id.*). After the surgery, he was told by a physician that the only remaining option was to replace his knees, but that he was too young for the procedure because the replacements would only last for ten years. (*Id.*). His other impairments include a lower groin hernia, sleep apnea, psoriasis, and obesity. He stated he was five feet nine inches tall and weighed over 400 pounds, but had not weighed himself because he did not have access to a scale. (R. 16). He took Vicodin for his knee pain every four to five hours, and medication for his diabetes. (R. 16-17). He did not use a cane, probably would not have trouble lifting 20 pounds. Because of his knee he had problems climbing a flight of stairs. (R. 17).

Mr. Accurso stated that he had six steps to enter his home and had to lean on the railing to climb them. (R. 17). He could not bend at the waist very far, was unable to stoop, and could not stand for one to two hours because of his knee pain. (R. 17, 22). He could take care of himself and did whatever he could to help out around the house. (R. 18). He could mow his lawn, but with great difficulty. He mowed it a week prior to the hearing while his brother, who normally did it, was on vacation. It was "very difficult" for him. (R. 18). Mr. Accurso stated that he drove a car five minutes to the grocery store alone. (*Id.*). He spent his day watching television, sleeping a few times a day, and exercising by walking around the house, into the

backyard, or going to the store. (R. 18-19). He was willing to do any job that would not put him to sleep or require him to walk much. (R. 19). He had difficulty sleeping the past four to five months because of his sleep apnea; he did not use his CPAP machine because the machine would dry his throat and he would awake in the morning not being able to catch his breath. Mr. Accurso stated that he had two hernias, one which was surgically removed, but due to complications during surgery, the other hernia remained. (R. 20). His hands and feet would swell once or twice a week, which came about in the past six to seven months before the hearing, and his water pills did not reduce the swelling. (R. 21-22). The swelling affected his ability to close his left hand. (R. 21.)

### 2. The 2012 Administrative Hearing

At the June 7, 2012 administrative hearing, Mr. Accurso testified that he was forty-five years old, and that he had not been engaged in any work since the prior September 17, 2009 administrative hearing. (R. 296-97). Since that hearing, he had medical tests for his weight and blood, which showed he had diabetes, high blood pressure, and psoriasis. (R. 297). He had carpal tunnel in his right hand. (*Id*.). Mr. Accurso felt his health was getting worse. (*Id*.). He reiterated that he had surgery on his right knee because of the deterioration, and that months later he still had bad pains. (R. 298.)

The physician specialist advised him of the possibility of knee replacements but also informed him that he was too young to receive them. (*Id*). He was having knee problems before 2006, and there were times where his knees would swell and he was not able to walk. (R. 298-99). When he was employed, it would take him a while to get from his work building to his car. R. 299). After work, he had to stay thirty to forty-five minutes to sit back and relax so he could walk to his vehicle. (*Id*.). Other times, due to knee spasms, he was not able to drive after work,

and he would sit in his vehicle thirty minutes to two hours until the circulation stimulated his legs. (*Id.*)

Mr. Accurso stated that sometimes when he stood, his knees popped or locked, and he had to hold himself up until they popped back into place. (R. 300). In 2006, he was taking narcotic pain medication for his knee pain, and every morning he would take one to two hour Jacuzzi baths to relieve the pain and pressure in his legs. (*Id.*). If he sat too long, thirty minutes to one hour, he would experience poor circulation, causing his knees and legs to fall asleep. (R. 301). When he stood up he would stay in one place, because there were times in the morning when he arose from bed and fell straight on his face. (*Id.*). Mr. Accurso stated that he could walk only one-half block to one block maximum, before he had shortness of breath and his legs bothered him. (R. 301). His pain medication affected his concentration. He did not use a cane, but held onto furniture for balance. Previously, he had steroid injections in his knees; however, the injections were not helpful in relieving his pain. (R. 303.)

## C. The Medical Evidence[3]

On May 21, 2004, Mr. Accurso was seen at PrimeCare Family Physicians, Ltd. ("PrimeCare") by Dr. Max Pitlosh, D.O. (R. 240). He weighed in at 315 pounds. (*Id.*). Dr. Pitlosh indicated that Plaintiff was obese, experienced knee pain, had sleep apnea and complained of dry mouth. (*Id.*). Dr. Pitlosh's treatment plan included a repeat MRI by Dr. Richard J. Hayek, M.D., continuation of his CPAP machine at full humidity, and instructions to keep Plaintiff's mouth moist. On May 27, 2004, Radiologist Mohammad Rezai, M.D., completed an MRI on Plaintiff. (R. 216-17). The notes indicated pain in both knees and internal derangement in the left knee. (R. 216). Dr. Rezai's impression of the left knee was that there was

---

[3] Because the ALJ found Mr. Accurso was disabled as of May 1, 2009, only the medical record prior to that date is dismissed.

small joint effusion and mucoid degeneration involving the posterior horn of the medial meniscus. (*Id.*). Dr. Rezai's impression of the right knee was that there was severe mucoid degeneration of the posterior horn of the medial meniscus, mild joint effusion, partial tear or mucoid degeneration of the anterior cruciate ligament, and a small lesion in the femoral metaphysis which was probably benign; however, correlation of the radiograph of the knee joint was advised. (R. 217).

On June 30, 2004, Dr. Hayek corresponded with Dr. Pitlosh about Plaintiff's MRI. Dr. Hayek explained that Plaintiff appeared to have degenerative tear of his medial meniscus that was most symptomatic. (R. 236). Dr. Hayek further stated that he did not believe Plaintiff had an ACL tear, but a symptomatic degenerative meniscal tear and that arthroscopy of the right knee was recommended and scheduled for July 9, 2004. (*Id.*). Dr. Hayek's letter included examination notes, which stated that MRIs were reviewed and were characteristic of effusion, degenerative meniscal tear of the medial meniscus of the right knee, and there was signal abnormality around the ACL but that it did not clinically correlate. (R. 207). There was no evidence of bone narrowing and there was minimal narrowing on both knees. (R. 207-08).

On March 22, 2005, Plaintiff was again seen at PrimeCare. (R. 242). Plaintiff needed a physician's note to go back to work after his arthroscopy. (*Id.*). It was noted that Plaintiff wanted to go back to work in spite of his pain. (*Id.*). Plaintiff was prescribed Diclofenac and glucosamine for his pain. (*Id.*)

On April 4, 2006, Plaintiff sought treatment at PrimeCare. (R. 204). Plaintiff had pain in his lower left abdomen and a CT scan was ordered. (*Id.*). On April 6, 2006, Dr. Pitlosh performed a CT scan. (R. 214). The impression of the CT scan showed fatty infiltration of the liver, a 7.1 x 6.3 cm omental hernia through the defect in the anterior abdominal wall at the level

of the umbilicus, and otherwise normal post infusion of the abdomen and pelvis. (*Id*.). A record dated April 27, 2006 noted that Plaintiff was taking hydrocodone for pain. (R. 218). On May 9, 2006, Plaintiff was seen at PrimeCare by Dr. Peter A. Calabrese, D.O. (R. 247). It was noted that Plaintiff complained of knee pain. (*Id*.). As a result of Plaintiff's complaints, there were two consultation requests made. (*Id*.). The first request was to Dr. Hayek, concerning Plaintiff's knee pain. (R. 245). The second request was to Dr. Robert Geller, M.D., concerning to Plaintiff's intermittently symptomatic umbilical hernia. (R. 245-46).

On May 11, 2006, Dr. Hayek corresponded with Dr. Calabrese, noting that Plaintiff was morbidly obese, weighing 340 pounds. (R. 202). Dr. Hayek stated that Plaintiff had a right arthroscopy two years prior and that Plaintiff's knee symptoms had worsened. (*Id*.). Plaintiff's knee x-rays revealed early degenerative changes in his medial compartment. (*Id*.). Dr. Hayek noted that Plaintiff stated he did reasonably well after his first knee surgery and did not follow up, but since his arthroscopy, he had increasing pain medially when he first gets up; however, Plaintiff did not complain of swelling or felt giving way. (R. 219-20). Dr. Hayek concluded that Plaintiff had early medial compartment arthritis, no evidence of internal derangement, and morbid obesity, stating, "plaintiff certainly requires definitive weight reduction and that the component of his medical complaints are related to his weight, and that there was presently no surgical solution at the present time." (R. 203).

On May 23, 2006, after hernia surgery, Plaintiff was admitted to Gottlieb Memorial Hospital. (R. 212). Hospital notes indicated that during the procedure, Plaintiff had to be intubated because he developed hypopnea and hypoxia (shallow breathing and a lack of oxygen). (*Id*.). On July 10, 2006, Dr. Geller corresponded with Dr. Calabrese, confirming Plaintiff's hernia surgery. (R. 237). On September 29, 2006, Dr. Calabrese sent a consultative request to Dr.

Hayek, concerning Plaintiff's pain. (R. 243). The request stated that Plaintiff was "unable to realistically lose weight" and requested Plaintiff's evaluation for Viscosupplementation (hyaluronic acid injections). (*Id*.). The notes of record include Plaintiff's statement that he had at least four previous steroid joint injections within a period of three years, and the previous injections did not work. (R. 244).

On November 27, 2007, Plaintiff was seen at PrimeCare. (R. 248). The notes indicate Plaintiff was again experiencing knee pain, and that he suffered from knee degenerative joint disease and knee swelling. (*Id*.). It was indicated that Plaintiff stopped using his CPAP machine because of his throat drying and that he wanted bloodwork performed. (*Id*.). The lab work indicated that Plaintiff's Hemoglobin A1C was too high and consistent with diabetes. (R. 219-20). On November 29, 2007, Dr. Calabrese referred Plaintiff to Registered Nurse Donna Billmeier, R.N. for diabetic teaching, diet instructions and glucometer testing instructions. (R. 199-200.)

On March 10, 2008, Dr. Debbie L. Weiss, M.D., a consultative physician, performed a consultative examination for the Bureau of Disability Determination Services. (R. 256). Dr. Weiss noted that during the physical examination, Plaintiff was 5'7" in height without shoes. (R. 258). His weight could not be measured, and Plaintiff stated he weighed over 400 pounds. (*Id*.). Plaintiff's blood pressure was 124/88 with a pulse 68 beats per minute and regular. (*Id*.). Dr. Weiss noted that Plaintiff was morbidly obese and that he appeared to be dyspneic (short of breath) getting onto and off the examination table and walking across the ten foot room. (*Id*.). Further, Dr. Weiss noted that Plaintiff had a great deal of difficulty sitting up from a supine position and it made him become short of breath. (*Id*.). Dr. Weiss noted that Plaintiff's abdomen was obese and soft with no masses present, but that "it would be difficult to find a mass because

of Plaintiff's obesity." (R. 259). There was hyperpigmentation on both shins, and no venous stasis changes of the lower extremities. (*Id.*). Plaintiff was able to bear own weight, squat, and do heel to shin and tandem walking (heel to toe) without difficulty. (R. 259-60). There was decreased range of motion in both knees: flexion was eighty degrees, and crepitation was present in both knees, the right knee more than the left. (R. 259). Further, Dr. Weiss noted that Plaintiff's finger and hand grasp was unimpaired in both hands. (*Id.*)

On March 12, 2008, Dr. Vidya Madala, M.D., a consultative physician, reviewed the medical record on behalf of the Agency. She noted that Plaintiff could not be weighed because he was over 400 pounds, with a body mass index of above sixty-two (62). (R. 262-69). Dr. Madala felt that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand at least two hours in a work day, sit about six hours in an eight hour workday, and was limited in his lower extremities. (R. 262-63). How she came to these conclusions was unexplained. Dr. Madala noted postural limitations of frequently balancing, occasionally climbing ramp/stairs, kneeling, crouching, and crawling, and never climbing ladders, ropes, or scaffolds. (R. 264).

On July 7, 2008, Dr. Towfig Arjmand, M.D., another reviewing physician, completed a subsequent consultative RFC Assessment. (R. 272). Dr. Arjmand noted that Plaintiff was limited by degenerative joint disease and obesity. (*Id.*). Dr. Arjmand indicated that Plaintiff's knee exam revealed limited range of motion and crepitus, and he noted that the "activities of daily living limitations are credible and consistent with the medical evidence of record." However, Dr. Arjmand affirmed the March 12, 2008 consultative RFC assessment. (R. 271-72).

On January 17 and January 31, 2009, Plaintiff was seen at the River Grove Clinic by Dr. David D. Demorest, M.D., complaining of swelling and pain in both knees. (R. 282, 284). Dr. Demorest indicated Plaintiff suffered from morbid obesity, knee pain, and psoriasis. (R. 282).

On March 7, 2009, Dr. John Gall, M.D., transcribed Plaintiff's knee x-ray. (R. 277, 279). Dr. Gall concluded that there were osteoarthritic changes about the right and left knee joints, and they were more prominent medially than laterally in the left knee. (R. 277-78.)

### D.    The Vocational Expert's Testimony

At the September 17, 2009 administrative hearing, Vocational Expert ("VE") William Schweis testified. The ALJ asked the VE whether the following hypothetical person could perform any of Plaintiff's past work. (R. 27). The hypothetical person would be of same age, education, and work experience as Plaintiff, and have an RFC limiting him to the lifting required of light work and the sitting of sedentary work, with certain additional limitations on standing and walking such that the person could not do that as would ordinarily be required of light work, but could do it at least two hours in an eight hour work day; and the person would also be subject to limitations against any climbing of ladders, ropes, or scaffolds, more than occasional kneeling, stooping, crouching, crawling and climbing of ropes and stairs. (*Id*.). –

The VE stated that the hypothetical person's skills would not be transferable from past work; but other jobs would be available, including information clerk, telephone marketing clerk, gate guard and some cashier positions, each one with an excess of 4,000 positions in the greater Chicago Metropolitan Area, except gate guard which would be in the 3,000 range. (R. 28). The VE testified that if the person was unable to use the left hand it would reduce cashier positions approximately twenty-five percent, and if the person was limited to walking no more than a block and standing less than an hour, it would reduce the numbers approximately fifty percent. (R. 28-29).

The VE noted that if the ALJ was to fully credit Plaintiff's testimony, then Plaintiff would not be able to perform full time competitive work. (R. 29). The VE particularly noted the

following impairments: the swelling of Plaintiff's hands and feet, which would require Plaintiff to sit down for a period of time and wait for them to go down; having to sleep at least one to two hours a day during work hour. Such a person would be short of breath and need to take strong medications. (*Id*.).

**E.        The ALJ's October 15, 2009 Decision**

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his application date of February 1, 2006. (R. 43). At step two, the ALJ concluded that Plaintiff had severe impairments of arthritis affecting his knee, a history of torn ankle ligaments, diabetes mellitus, possible kidney impairment, and since May 1, 2009, swelling in his feet and left hand. (*Id*.). At step three, the ALJ concluded that the impairments alone or in combination, did not meet or medically equal a Listing. (*Id*.). At step four, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible prior to May 1, 2009, to the extent they were inconsistent with Plaintiff's RFC. (R. 44). This was error. *See infra* at 30.

The ALJ adopted the RFC reports of the consultative physicians, Drs. Weiss, Madala, and Arjmand, and determined that prior to May 1, 2009, Plaintiff retained the RFC to perform the full range of sedentary work, with the following limitations: occasionally lift twenty pounds, frequently lift ten pounds, stand at least two hours in a work day, sit about six hours in an eight hour workday, and subject to the postural limitations of frequently balancing, occasionally climbing ramp/stairs, kneeling, crouching, crawling, and never climbing ladders, ropes, or scaffolds. (R. 43, 45). The ALJ concluded that due to Plaintiff's condition worsening, he could

not perform his past relevant work or even sedentary work on a sustained basis after May 1, 2009. (R. 45-46).

At step five, based upon the VE's testimony and Plaintiff's age, education, work experience, and RFC, the ALJ concluded that Plaintiff could perform jobs existing in significant numbers in the economy prior to May 1, 2009.

### F.    The District Court's Remand Order

On February 9, 2011, Judge Der-Yeghiayan remanded the case due to the deficiencies in the ALJ's analysis at steps three and five. *Accurso v. Astrue*, 2011 WL 578849 (N.D. Ill. 2011). First, the ALJ was directed to review the evidence and address in requisite detail the issue of whether Plaintiff's impairments, including his obesity, met or exceeded a listed impairment at step three. (*Id.* at *4). The Court noted that the ALJ did not address key points of medical evidence such as Plaintiff's obesity and other relevant medical history from Plaintiff's treating physicians, Drs. Hayek, Geller, and Calabrese. Nor did the ALJ address Dr. Weiss's comments on Plaintiff's obesity and shortness of breath. (*Id.*).

Further, the Court concluded that the ALJ failed to specify why Plaintiff's impairments failed to meet Listing 1.02, and stressed that an ALJ cannot satisfy his obligation of "building an accurate and logical bridge from the evidence to the conclusion, with conclusory statements, but must base the denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." (*Id.* at *3-4). *See Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).

Second, the ALJ was directed to address Plaintiff's limitations at step five in light of his obesity; specifically, the effects Plaintiff's obesity had on his impairments such as his sleep apnea, and the effects of his knee pain. *Accurso*, 2011 WL 578849, at *4.

Third, the ALJ was directed to address the issue of Plaintiff's credibility. (*Id*. at *6). The court noted that when making a credibility determination an ALJ must "consider the entire case record," and a "credibility determination must contain specific reasons for the finding on credibility, supported by the evidence in the record." *Accurso*, 2011 WL 578849, at *6. *See Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). Thus, the ALJ was directed to address how Plaintiff's statements "concerning the intensity, persistence and limiting effects of his symptoms," combined with the medical evidence, were not credible. (*Id.*)

Fourth, the ALJ was directed to reexamine the RFC assessment. (*Id*.). An RFC assessment "must be based on all of the relevant evidence in the case record," which includes "medical history, medical signs, and laboratory findings, the effects of treatment …, reports of daily activities, … recorded observations, medical source statements, and effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment…." SSR 96-8p. *See Accurso*, 2011 WL 578849, at *6. Specifically, the ALJ did not address how Plaintiff's impairments would allow him to perform the full range of sedentary work prior to May 1, 2009, but not thereafter. *Accurso*, 2011 WL 578849, at *6.

Finally, the court directed the ALJ to address the issue of Plaintiff's disability onset date. SSR 83-20 provides that "the determination of onset involves consideration of the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity." *Accurso*, 2011 WL 578849, at *6; *see* SSR 83-20. The ALJ was directed to discuss in detail how the medical evidence contradicted the alleged onset date. *Accurso*, 2011 WL 578849, at *6. Where the alleged onset date is consistent with the medical and other evidence, an ALJ is required under SSR 83-20 to adopt the alleged onset date. *Lichter v. Bowen*, 814 F.2d 430, 435 (7th Cir. 1987).

### 1. The ALJ's 2012 Decision on Remand

The ALJ said he was evaluating Listing 1.02 in more detail to determine whether Plaintiff's obesity, together with his other impairments, met or medically equaled the requirement of any listed impairments. The ALJ mentioned Plaintiff's treatment records from Dr. Calabrese from May 2004 through December 2007 (R. 311) and detailed Dr. Weiss's RFC report, opining that Plaintiff was not weighed and measured at five feet seven inches without shoes. (*Id*.). Ignored was the virtually contemporaneous correspondence in May 2006 from Dr. Hayek to Dr. Calabrese informing him that Plaintiff was 340 pounds and that Plaintiff's knee symptoms had worsened. Dr. Hayek informed Dr. Calabrese that since his arthroscopy, Mr. Accurso had increasing pain when he first gets up. Dr. Calabrese was informed the Plaintiff's obesity was obviously related to his medical situation. (R. 202-203, 219-20). Even in 2004, Plaintiff was complaining of shortness of breath, and that his left ankle occasionally gave out. (*Id*.).

The ALJ said that Dr. Weiss's examination of Plaintiff did not reveal abnormal heart or lungs, nor did it reveal rales, rhonchi, wheezing, or decreased ranges of motion except for the knees. (*Id*.). But these were matters never in dispute at any time in the case. The ALJ noted that the records of Dr. Weiss showed Plaintiff was able to bear his own weight, squat, and perform tandem and toe heel walking. (*Id*.). But not for any appreciable distance. Being able to navigate across a doctor's examining room shows little, if anything. Similarly, in the context of this case, the absence of neurological abnormalities in the upper or lower extremities was clearly not sufficient to find that the Plaintiff was not disabled.

Nonetheless, the ALJ concluded that the record was adequate for determination that Plaintiff's impairments did not meet or medically equal the requirements of medical Listing

1.02, at any time prior to May 1, 2009. (*Id*.). In addition, the ALJ found significant Plaintiff's admission at the previous administrative hearing in 2009 that he mowed his lawn with a non-riding mower one week earlier, as evidence of Plaintiff not meeting or medically equaling the requirements of medical Listing 1.02. (R. 312).

The ALJ discussed Plaintiff's sleep apnea and indicated there was no evidence that the impairment caused significant limitations on his functional capacity during the relevant period. (R. 312). Next, the ALJ addressed Plaintiff's diabetes and obesity, stating that insulin was not prescribed and there was no evidence of impairment causing limitations. (*Id*.). Further, the ALJ noted that although Plaintiff claimed to be over 400 pounds, the only weight reflected in the medical records was 340 pounds in May of 2006. (*Id*.). The ALJ opined that x-rays during the period at issue were noteworthy for only mild or early degenerative changes in the right knee, and that obesity in and of itself, without significant mechanical restrictions, could not be found to meet the requirements of a listed impairment. (*Id*.). The ALJ concluded that there was no new evidence since 2009 and reiterated Plaintiff's testimony of his daily activities from the previous September 17, 2009 administrative hearing. (R. 313). The ALJ concluded, after supposedly "careful consideration of the entire record," there was no basis to disturb the finding in the previous decision that prior to May 1, 2009, the Plaintiff's impairments did not meet or equal a listed impairment and allowed a full range of at least sedentary work at all times." (*Id.*)

## DISCUSSION

## I.  THE  LEGAL STANDARD

Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 416.920(a)(4).

An affirmative answer at either step three or step five leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at steps three and five, precludes a finding of disability. (*Id*.). The claimant bears the burden of proof at steps one through four. (*Id*.). Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. (*Id*.).

## II.    JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the

Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841; *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)(an ALJ's decision must be affirmed even if "'reasonable minds could differ'" as long as "the decision is adequately supported").

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ must at least minimally articulate the "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe* ex rel. *Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions . . . and must adequately articulate his analysis so that we can follow his reasoning . . . ."); *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). *See also Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) ("This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence.").

## III.    ANALYSIS

Plaintiff argues that the ALJ's decision was in error because: (1) the ALJ failed to follow the law of the case doctrine; (2) the ALJ did not properly assess whether Plaintiff met Listing 1.02; (3) the ALJ erred in his credibility determination; and (4) the ALJ erred in assessing Plaintiff's RFC and onset date.

### A.    The Law of the Case Doctrine

Plaintiff argues that the ALJ failed to apply the law of the case doctrine because he did not follow Judge Der-Yeghiayan's February 9, 2011 remand order, which mandated that the ALJ address the deficiencies in his step three and five analysis. Plaintiff argues that the District Court specifically instructed the ALJ to "address in requisite detail" the issue of whether Plaintiff's impairments, including obesity, meets, equals or exceeds a listed impairment, and in addition to basing his conclusion on adequate evidence "explain why contrary evidence does not persuade." (Pl.'s Br. at 10). Plaintiff contends that the ALJ failed to comply with the District Court's directive, and again offered insufficient conclusory statements in his decision. ("Claimant's impairments did not meet or equal the requirements of medical listing 1.02 at any time prior to May 1, 2009. The medical evidence simply does not indicate that the claimant was experiencing an 'inability to effectively ambulate' as required by listing 1.02.").

Specifically, Plaintiff contends that in evaluating Listing 1.02, the ALJ failed to mention the key facts that Judge Der-Yeghiayan ordered to be addressed, such as Dr. Geller's observation that Plaintiff was morbidly obese; Dr. Calabrese's report documenting Plaintiff's morbid obesity and "persistent bilateral knee pain," which was not alleviated by repeated steroid injections; a report of Plaintiff's shaky knees after walking a block, and frequently becoming short of breath

and experiencing pain after climbing a few stairs; or Dr. Weiss's personal observations that Plaintiff became short of breath after getting on and off the examination table, after walking approximately ten feet across the room, and upon sitting up from a supine position.

Defendant asserts, quite unpersuasively, that the ALJ sufficiently explained his finding that Plaintiff was not disabled before May 1, 2009. Defendant argues that no medical evidence between February 2, 2006 and May 1, 2009 substantiated that Plaintiff's obesity and other ailments caused severe ambulatory or other impairments that would have demonstrated that Plaintiff met Listing 1.02B and/or that Plaintiff could not perform sedentary work. Specifically, Defendant contends that the ALJ noted that "Plaintiff reported to Dr. Hayek that aside from 'increasing pain medially' when he first stands, 'he does not feel giving way' and did 'reasonably well' following an arthroscopy for knee pain; indeed Dr. Hayek mentioned no ambulatory aids or limitations nor recommended any serious treatment." (Def.'s Mem. at 4). Further, Defendant contends that until May 1, 2009, only three medical professionals, Drs. Weiss and the two state agency consultative physicians, commented on the extent to which any of Plaintiff's ailments actually restricted his functioning. (*Id.*). Defendant also emphasizes Dr. Weiss's report that Plaintiff could walk without difficulty or assistance, including tandem and heel to shin walking – something that could not have lasted more than a matter of seconds.

The Commissioner also contends that Plaintiff's statements and indications were contrary to the evidence because Plaintiff did not mention sitting, sleeping, or fingering problems to any medical professional. Plaintiff also told Dr. Weiss that a mask controlled his sleep apnea, and Plaintiff's self-reported activities, such as driving and shopping alone for food, clothes, and shoes; doing household chores; not needing assistance to walk; climbing the six stairs leading to his house after leaning on railings; walking fifty to sixty feet (not the ten feet observed by Dr.

Weiss during her examination – a distance limited and determined by the size of her office) – before needing rest; and most importantly cutting the grass around his house in September 2009 contradicted many of the requirements of Listing 1.02B. Defendant contends that Plaintiff's words and actions confirm the objective medical findings that Plaintiff can perform sedentary work, discrediting his account of severe ambulatory limitations.

Next, Defendant contends that the court can demand nothing more of the ALJ, and that the law does not require the ALJ to evaluate in writing every piece of evidence. It requires only that the ALJ sufficiently articulate his reasoning so that a court can trace his reasons for rejecting or accepting particular pieces of evidence and arriving at the conclusion that he did. As a general proposition, of course that's true. But general propositions do not decide concrete cases. It is nonsensical to say, for example, that it was unnecessary to address evidence like Dr. Weiss's observations of the difficulty Plaintiff experienced getting on and off the examination table and sitting up from a supine position. The significance of the conclusion by Dr. Arjmand in 2008 that the activities of daily living limitations are credible and consistent with the medical evidence of record are equally obvious. (R. 271-72). It was simply not enough for the ALJ to note matters like this but ignore them in his calculus of credibility and disability. It is the analysis of evidence that counts and that is required. If mentioning the evidence in the record were sufficient, no case could ever be reversed since it is the practice of the ALJs – at least in this district and probably throughout the country – to note the evidence presented at the hearing.

The law of the case doctrine states that "once an appellate court either expressly or by necessary implication decides an issue, the decision will be binding upon all subsequent proceedings in the same case." *Key v. Sullivan*, 925 F.2d 1056, 1060 (7th Cir. 1991). The law of the case doctrine, which requires "the trial court to conform any further proceeding on remand to

the principles set forth in the appellate opinion unless there is a compelling reason to depart," *Law v. Medco Research, Inc.*, 113 F.3d 781, 783 (7th Cir. 1997), is applicable to judicial review of administrative decisions. *Key*, 925 F.2d at 1060; *Chicago & Northwestern Transportation Co. v. United States*, 574 F.2d 926, 929–30 (7th Cir. 1978). It requires the administrative agency, on remand from a court, to conform its further proceedings in the case to the principles set forth in the judicial decision, unless there is a compelling reason to depart. *Wilder v. Apfel*, 153 F.3d 799, 803 (7th Cir. 1998).

Here, the ALJ did not comply with Judge Der-Yeghiayan's February 9, 2011 remand order because he failed to address the deficiencies in his five step analysis, specifically at steps three and five. The ALJ did not "address in requisite detail" the issue of whether Plaintiff's impairments, including obesity, meets, equals or exceeds a listed impairment, and in addition to basing his conclusion on adequate evidence "explain why contrary evidence does not persuade," as the Court instructed. *See Accurso*, 2011 WL 578849, at *3-4.

In his decision, the ALJ noted treatment records from Dr. Calabrese from May 2004 through December 2007, and that Plaintiff was 5'8" tall, weighed 340 pounds, and had past right knee arthroscopy where the knee was found with "minor" medial wear and synovitis. (R. 311). The ALJ stated that Plaintiff reported knee pain when he first stood, but no swelling or giving away of the knee, and that there was no mention of an inability to ambulate or need of an assistive device. (*Id.*). Further, the ALJ opined that Plaintiff underwent hernia surgery, but that the notes "did not indicate complications from the surgery or that the procedure and impairment impacted the claimant's ability to ambulate or affected his overall functional capacity significantly for a continuous period of twelve months." (*Id.*).

The ALJ concluded that there was no further evidence dating back to February 1, 2006, the alleged onset date of disability, and that the conclusion that Plaintiff's impairments did not meet or medically equal the requirements of a listed impairment prior to May 1, 2009 had support in the report of Dr. Weiss. But that was wrong, as we have seen.

An ALJ cannot satisfy his obligation with conclusory statements, but must base the denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Accurso*, 2011 WL 578849, at *4; *Berger,* 516 F.3d at 544. Simply pointing to isolated statements, while ignoring "evidence that suggests an opposite conclusion" is insufficient. *Scrogham*, 765 F.3d at 698. That is what the ALJ did here by failing to properly assess the content of the medical records of Drs. Hayek, Rezai, Pitlosh, Geller, and Calabrese, as well as several of Dr. Weiss's notes.

Judge Der-Yeghiayan's February 9, 2011 remand order specifically listed medical evidence contrary to the ALJ decision that needed to be addressed. *Accurso*, 2011 WL 578849, at *3-4. Nonetheless, the opinion either glossed over or did not mention the undisputed fact that Mr. Accurso was morbidly obese at all times between 2006 and 2009. Indeed, his body mass index was over 62[4] and his weight varied from 340 to over 400 pounds. During most of the relevant period, his weight was about 400 pounds.[5] The medical evidence reflected that during that period, plaintiff experienced "persistent bilateral knee pain" which required him to take narcotic medicine for pain. Ignored by the ALJ was the medical evidence showing shortness of

---

[4] A normal body mass index is between 18.5 and 24.9, according to WebMD and the National Institute of Health, which is an agency of the U.S. Department of Health & Human Services. This entry is self-authenticating under Rule 902(5).

[5] Not only does the medical evidence in the record support that this was the Plaintiff's weight – it varied depending on the year, always increasing, – but there is absolutely nothing to warrant the ALJ's apparent rejection of the Plaintiff's statement at the hearing that he weighed 400 pounds.

breath upon the slightest exertion, weak and shaky knees, the inability to walk more than a block, at most, the inability to climb more than a few stairs without pain and becoming short of breath. Indeed, inexplicably, the ALJ ignored Dr. Weiss's 2007 observation that Plaintiff became short of breath after getting on and off the examination table and after walking approximately ten feet across her room. The same occurred when Mr. Accurso tried to get up from a supine position in Dr. Weiss's office.[6]

### B. Obesity

The ALJ did not properly assess whether Plaintiff met Listing 1.02, specifically Plaintiff's inability to ambulate effectively due to the effects of his obesity causing major joint dysfunction. 20 C.F.R. 404, Subpart P, App. 1, § 1.02 is listed as:

> *Major dysfunction of a joint(s) (due to any cause)*: [c]haracterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)…[w]ith:…[i]nvolvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.…"

Section 1.02 states that:

> [r]egardless of the cause(s) of a musculoskeletal impairment, functional loss for purposes of these listings is defined as the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and gross movements effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment. The inability to ambulate effectively or the inability to perform fine and gross movements effectively must have lasted, or be expected to last, for at least 12 months.

As a review of the earlier portions of this Opinion show, there was evidence for the period between 2006 - 2009 that supported the Plaintiff's theory of the case and an outcome

---

[6] The Plaintiff also manifested shortness of breath during his hernia surgery, and had to be intubated because he developed hypopnea and hypoxia (shallow breathing and a lack of oxygen). (R. 212).

favorable to him. As discussed earlier, the Plaintiff, himself, testified that his chronic knee situation prevented him from working as an installer of computer flooring beginning in early 2004. Indeed, prior to 2006 there were times that his knees swelled so badly that he could not walk. Even when he was employed it was difficult to get from his work building to his car. After work it took him as much as 3/4 of an hour before he could walk to his car. And even then he would have to sit in his car because of knee spasms for a ½ to 2 hours. (R. 298-300). Often his knees popped or locked and he could not stand unaided. (R. 300). In 2006 he was talking narcotic pain medication for his knee pain and had to take lengthy jacuzzi baths to relieve the pain and pressure in his legs. If he sat for longer than 30 minutes to an hour, his legs would fall asleep. (R. 301). While he did not use a cane – the ALJ found this significant – he had to hold on to furniture for balance. Steroid injections did nothing to ease his pain. (R. 301-303).

All of this evidence and that discussed above were not considered by the ALJ.

By 2004, Mr. Accurso weighed 315 pounds. The medical evidence showed that he experienced pain in both knees and internal derangement in the left knee. There was severe degeneration in the right knee. (R. 216-17, 240). Despite his pain, Plaintiff wanted to go back to work. (R. 207-208). In 2006 the pain was so severe that narcotic medicines were still be administered, one of which was hydrocodone. Mr. Accurso's knee pain continued to be severe – no doubt exacerbated by Plaintiff's weight which was up from 315 pounds in 2004 to 340 pounds. (R. 202). By May 2006, the medical evidence shows that Plaintiff's knee symptoms has worsened and there were early degenerative changes observed on x-rays. (R. 202). The pain had increased since his arthroscopy in 2004. (R. 219). Dr. Hayek said that Mr. Accurso was morbidly obese and concluded in 2006 that "the component of his medical complaints are related to his weight, and that there was "no surgical solution" at the present time. (R. 203). Between

2004 and 2006, Mr. Accurso had had four steroid joint injections, which accorded him no relief. (R. 244).

In 2007, the Plaintiff was still experiencing knee pain and suffering from knee degenerative disease and knee swelling. (R. 243). Mr. Accurso's diabetes was not under proper control as reflected by an elevated A1C. (R. 219). This, of course, was also weight related. In 2008 Mr. Accurso was so obese that his weight could not be measured. He was so heavy that he could not get on and off a doctor's examination table and walk across a 10 foot room without experiencing shortness of breath. The same was true of Mr. Accurso's attempt to sit up from a supine position. So obese was Mr. Accurso that Dr. Weiss noted that it would be difficult to find a mass in Plaintiff's abdomen. (R. 298). On March 12, 2008, Dr. Madala noted Plaintiff's weight at over 400 pounds, with a body mass index above 62. (R. 262).[7]

While the ALJ alluded to some of this evidence, other parts were ignored. And even those isolated instances where he took note of the evidence, he made no attempt to explain why it did not conflict with his ultimate conclusions and how he was able to conclude in light of the evidence that Mr. Accurso only became disabled in 2009.

While the SSA "has removed obesity as a separate listing from the list of disabling impairments," *Castile v. Astrue*, 617 F.3d 923, 928 (7th Cir. 2010) (*citing* SSR 02-1p), an ALJ is required to consider a claimant's obesity in evaluating the severity of his other impairments and his ability to work generally since morbid obesity may make a person unable to perform even sedentary jobs. *See also Browning v. Colvin*, 766 F.3d 702, 706 (7th Cir. 2014). The Seventh Circuit found reversible error when the ALJ failed to consider the effect of a body mass index of

---

[7] Dr. Madala, a consultative physician reviewing the medical record on behalf of the Agency concluded without explanation that Mr. Accurso could stand for at least 2 hours in a work day and sit for about 6 hours in an 8 hour work day. (R. 262). Without some explanation, the ALJ was not justified in simply accepting as true what appears to be a non sequitur – or at least a conclusion not borne out by the balance of the medical evidence or explanation by the doctor.

over 40 on knee pain. *Martinez v. Astrue*, 630 F.3d 693, 689-99 (7th Cir. 2011). Here, Mr. Accurso's body mass index was in excess of 62!

The record in this case shows indisputably that Plaintiff's morbid obesity affected his other medical conditions and consequently his ability to walk, stand unaided, sit up without becoming winded – indeed, his ability to work generally. This situation did not begin in 2009 but was manifest by 2006, if not earlier. The ALJ's contrary decision was arrived at by ignoring the evidence that conflicted with his conclusion that the onset date was 2009.

Under Judge Der-Yeghiayan's remand order and basic principles that govern Social Security cases, the ALJ was required to have explained his reasons for adopting the opinion in the RFC assessment prepared by Dr. Weiss, and Drs. Madala and Arjmand, both consultative non-examining physicians, and rejecting the evidence from Plaintiff's treating physicians. If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight. *See* SSR 96-2p. Here, the ALJ, without adequate explanation, subscribed to the unsupported conclusions of the non-treating physicians. While the ALJ may not ignore the opinions of state agency medical and psychological consultants, he must explain the weight given to these opinions in his decision, especially when it is contrary to other medical evidence and the implicit or explicit opinions of treating physicians. The ALJ here did not do that.

## C.    The ALJ's Credibility Determination

An ALJ's credibility determination is accorded substantial deference by a reviewing court unless it is patently wrong (*i.e.,* not supported by the record). *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). In assessing an ALJ's credibility finding, courts do not review the medical evidence *de novo,* but "merely

examine whether the ALJ's determination was reasoned and supported." *Elder*, 529 F.3d at 408. However, an ALJ must give specific reasons for discrediting a claimant's testimony, and those reasons must be supported by record evidence and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. *Lopez* ex rel. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003); *see* SSR 96-7p.

Even if the lack of objective medical evidence were a reason to reject a claimant's testimony – which it is not, *see Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005) – there was, as we have seen, an abundance of medical evidence that supported Mr. Accurso's claimed disability and the pre-2009 limitations that he described. When evaluating a plaintiff's credibility, the ALJ must also consider: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of pain; (3) the precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions. *See Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004); *see* SSR 96-7p at *3.[8]

The Commissioner contends that the ALJ's credibility determination was supported by Plaintiff's testimony regarding his daily activities. Mr. Accurso said at the hearings that he could drive and shop alone for food, clothes, and shoes; that he did household chores; that he did not need assistance to walk; that he could climb the six stairs leading to his home, as long as he could use the railing for assistance; that he could walk fifty to sixty feet (and not the mere ten feet observed by Dr. Weiss) before needing rest; and that most importantly, in September 2009,

---

[8] When the claimant attends an administrative hearing, the ALJ "may also consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements." SSR 96-7p at *5. The ALJ did not purport to base his credibility finding on Mr. Accurso's demeanor. And indeed, he credited Mr. Accurso's testimony at the prior hearing. Hence, his adverse credibility finding in this case cannot be based on Mr. Accurso's demeanor or conduct.

on one occasion, he cut grass around his house with a non-riding lawnmower, although with great difficulty.

Defendant contends that this testimony was sufficient to justify the ALJ's negative credibility determination and that the ALJ reasonably discredited the extent of Plaintiff's claimed limitations. And finally the ALJ also concluded that the plaintiff was not credible to the extent that his claims were inconsistent with his RFC.

We begin with the latter conclusion since it is so manifestly wrong. *See Pierce v. Astrue*, 2013 WL 147414, 10-11 (N.D.Ill. 2013)(collecting cases). The Seventh Circuit has repeatedly held that boilerplate language "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" is "meaningless" because it "yields no clue to what weight the trier of fact gave the testimony." *Bjornson v. Astrue,* 671 F.3d 640, 645 (7th Cir.2012)("The Social Security Administration had better take a close look at the utility and intelligibility of its 'templates.'"). *See also Moore v. Colvin.* 743 F.3d 1118, 1122 (7th Cir.2014)("We have repeatedly condemned the use of that boilerplate language because it fails to link the conclusory statements made with objective evidence in the record."); *Filus v. Astrue,* 694 F.3d 863, 868 (7th Cir. 2012)("It puts the cart before the horse, in the sense that the determination of capacity must be based on the evidence, including the claimant's testimony, rather than forcing the testimony into a foregone conclusion."); *Parker v. Astrue,* 597 F.3d 920, 921–22 (7th Cir.2010); *Martinez v. Astrue,* 630 F.3d 693, 696 (7th Cir.2011).[9]

---

[9] Simply using the phrase does not make a credibility determination invalid. Not supporting a credibility determination with explanation and evidence from the record does. *See Punzio v. Astrue,* 630 F.3d 704, 709 (7th Cir.2011); *Parker,* 597 F.3d at 921–22.

"The continued efforts of the Court of Appeals to eliminate this flawed phrasing and reasoning are reminiscent of Hercules's Second Labor with the Lernaean hydra. *See* APOLLODORUS, THE LIBRARY 189 (Sir James George Frazer trans., G.P. Putnam's Sons 1921) ("Nor could he effect anything by smashing [the hydra's] heads with his club, for as fast as one head was smashed there grew up two.")."*Hughes v. Colvin,* 2015 WL 2259833, 15 (N.D.Ill. 2015). This case proves the futility of their unceasing efforts.

Judge Der-Yeghiayan's February 9, 2011 remand order directed the ALJ to explain how the medical evidence from two of Plaintiff's treating physicians and Dr. Weiss, supported his finding that Plaintiff's testimony was not entirely credible and how, given that and other testimony, it could be concluded that the ALJ had "buil[t] an accurate and logical bridge from the evidence to the conclusion" that Mr. Accurso's testimony was not credible. *Accurso*, 2011 WL 578849, at *5.[10] Our previous review of the evidence suffices to demonstrate that the ALJ's conclusion is patently wrong and that there is wanting the necessary logical bridge so that the ALJ's reasoning can be assessed. Mr. Accurso's admission that on one occasion in 2009, the week before the first hearing, that he mowed his lawn, does not change this conclusion.

The fact that at that hearing Mr. Accurso stated that on one occasion in 2009 he had mowed his lawn ought to have reflected positively rather than adversely on the ALJ's assessment of his credibility. Certainly, only Mr. Accurso knew about the incident, and it would have been easy to lie about it. Beyond that, it proves nothing. Mr. Accurso said that he mowed the lawn one time with "great difficulty" and that it was an isolated event, the task normally falling to his brother who, at the time, was on vacation. The record is silent as to how long it

---

[10] In at least one case, the Commissioner vainly tried to defend it as "an indispensable aid to the Social Security Administration's overworked administrative law judges." But not even the Commissioner's lawyers know what the boilerplate or template means. *Bjornson* , 671 F.3d at 645.

took, the size of the lawn, or whether plaintiff required one or more breaks. Without that information, no accurate conclusions can be drawn.

The ALJ erred in focusing on the weight to be given to plaintiff's ability to drive to do minor errands – driving takes no effort – being able on occasion to walk short distances before becoming winded and to do so without a cane. The ALJ's focus on these sporadic incidents runs afoul of the Seventh Circuit's repeated criticism of ALJs for equating the ability to perform a few, sporadic activities with a capacity to maintain a full-time job. *Hill v. Colvin*, 807 F.3d 862 (7th Cir. 2015); *Engstrand v. Colvin*, 788 F.3d 655, 661 (7th Cir. 2015); *Spiva v. Astrue,* 628 F.3d 346, 352 (7th Cir.2010). In short, the ALJ's conclusion that the Plaintiff's credibility was suspect and that his claims were exaggerated cannot be supported. (R. 312).

### D.       The RFC Assessment and Onset Date

SSR 83-20 provides that the determination of onset date involves consideration of the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity. *Taylor*, 425 F.3d at 352. Where the alleged onset date is consistent with medical and other evidence, an ALJ is required to adopt the alleged onset date. *Lichter*, 814 F.2d at 435. Judge Der-Yeghiayan's remand order took issue with the ALJ's adoption of a May 1, 2009 onset date. *See Accurso*, 2011 WL 578849, at *5. The record on remand contains ample evidence that the Plaintiff's post-2009 situation was not particularly difference than the pre-2009 situation. The ALJ also did not explain how the medical evidence showed a material worsening of the Plaintiff's condition after May 2009.

## CONCLUSION

The Plaintiff's motion for summary judgment [Document. No. 18] is granted and the Commissioner's cross-motion for summary judgment is denied, and the case is remanded to the Commissioner for further proceedings consistent with this Order.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 2/4/16